| C.S. v Halstead |
|:---:|
| 2025 NY Slip Op 30128(U) |
| January 8, 2025 |
| Supreme Court, Kings County |
| Docket Number: Index No. 506708/17 |
| Judge: Genine D. Edwards |
| Cases posted with a "30000" identifier, i.e., 2013 NY Slip Op 30001(U), are republished from various New York State and local government sources, including the New York State Unified Court System's eCourts Service. |
| This opinion is uncorrected and not selected for official publication. |

At an IAS Term, Part 80 of the Supreme Court of the
State of New York, held in and for the County of
Kings, at the Courthouse, at 360 Adams Street,
Brooklyn, New York, on the 8th day of January 2025.

P R E S E N T:

HON. GENINE D. EDWARDS,

                          Justice.

-----------------------------------------------------------------------X

C.S., a Minor, by her Parent and Natural Guardian
TRACEY JACKSON, and TRACEY JACKSON, Individually,

                              Plaintiffs,

-against-

KELLY HALSTEAD, M.D.,
RAJESHREE CHINCHANKAR, M.D.,
PROFESSIONAL GYNECOLOGICAL SERVICES, P.C., and
METHODIST HOSPITAL OF BROOKLYN, d/b/a
NEW YORK-PRESBYTERIAN/BROOKLYN METHODIST
HOSPITAL,

                              Defendants.

-----------------------------------------------------------------------X[1]

DECISION AND ORDER

Index No. 506708/17

Mot. Seq. Nos. 3 and 4

The following e-filed papers read herein:        NYSCEF Doc Nos.:

| | |
|---|---|
| Notice of Motion, Affirmations, and Exhibits........................ | 84-103; 104-144 |
| Affirmations (Affidavits) in Opposition, and Exhibits.............. | 157-163; 165-171 |
| Reply Affirmations and Exhibits........................................... | 177-178; 180[2] |

In this action to recover damages for medical malpractice, lack of informed consent, and

loss of services, defendants Kelley Halstead, M.D. ("Dr. Halstead"), Rajeshree Chinchankar,

M.D. ("Dr. Chinchankar"), and Professional Gynecological Services, P.C. ("PGS"), jointly

moved, and defendant Methodist Hospital of Brooklyn, d/b/a New York-Presbyterian/

Brooklyn Methodist Hospital ("Methodist"), separately moved, in each instance, for summary

judgment dismissing all claims as against such defendants (Seq. Nos. 3 and 4, respectively).

---

[1] The caption herein conforms to the amended caption set forth in the Court's order, dated May 3, 2024.

[2] The Court did not consider the 300-page textbook of NEONATAL RESUSCITATION, Sixth Edition (2011)
(NYSCEF Doc No. 181), a copy of which was annexed as an exhibit to Methodist's counsel's reply affirmation.
Nor did the Court consider Methodist's counsel's citations to (or reliance on) the textbook in her reply
affirmation (NYSCEF Doc No. 180).

Plaintiffs C.S., a minor (the "baby" or "child"), by her parent and natural guardian Tracey Jackson (the "mother"), and the mother, individually (collectively, "plaintiff"), did not object to the dismissal of Dr. Chinchankar (and, by extension, PGS insofar as related to Dr. Chinchankar) from this action.[3] Further, plaintiff failed to address or specifically oppose the branches of defendants' motions that were for summary judgment dismissing: (1) the second cause of action alleging lack of informed consent; and (2) a portion of the third cause of action seeking to recover for the mother's loss of her child's consortium. *See Clarke v. New York City Health & Hosps.*, 210 A.D.3d 631, 177 N.Y.S.3d 681 (2d Dept. 2022); *Elstein v. Hammer*, 192 A.D.3d 1075, 145 N.Y.S.3d 572 (2d Dept. 2021); *see also Devito v Opatich*, 215 A.D.2d 714, 627 N.Y.S.2d 441 (2d Dept. 1995) ("the court erred with respect to that portion of the charge which included as an element of the parents' damage the loss of their minor daughter's society which is not compensable").

The remainder of this Decision and Order addresses plaintiff's principal theory of medical malpractice and her ancillary theory of recovery of "reasonable expenses necessarily incurred by the mother in an effort to restore the infant to health." *Gilbert v. Stanton Brewery*, 295 N.Y. 270, 67 N.E.2d 155 (1946).

---

[3] *See* Expert Affirmation of Plaintiff's Obstetrician and Neonatologist. By limiting the expert opposition to Dr. Halstead, plaintiff did not object to the dismissal of her direct claims as against Dr. Chinchankar, and her vicarious claims as against PGS insofar as predicated on Dr. Chinchankar's alleged acts/omissions.

## Summary[4]

In 2014,[5] the mother, age 29, was pregnant with her second child, a baby girl, with the estimated date of delivery of November 3rd. The mother was followed from the tenth week of her pregnancy on April 10th through the 40th week of her pregnancy on November 4th with Dr. Halstead, an employee of PGS.[6] The mother's pregnancy was generally uncomplicated, with the exceptions of: (1) the baby's "frank breech" (or the buttocks first) presentation that was sonographically confirmed multiple times over the course of the last four months of her pregnancy; and (2) the mother's Group B Streptococcus for which she was treated in the month of October with an oral antibiotic.[7] The baby's persisting breech presentation was the more concerning of the two because it might have required a C-section delivery.[8] Although a C-section would not be necessary if the obstetrician first attempted (but failed at) the "external cephalic version" ("ECV"),[9] Dr. Halstead made no attempt at ECV, nor did she inform the

---

[4] Because the record was voluminous in excess of 9,000 pages (without duplication), the Court assumed the parties' familiarity with the underlying facts, the procedural history of the case, and the well-established principle that "the court's role in adjudicating a motion for summary judgment . . . is issue identification, not issue resolution." *Speller v. Sears, Roebuck & Co.*, 100 N.Y.2d 38, 760 N.Y.S.2d 79 (2003).

[5] All references are to calendar year 2014, unless otherwise indicated.

[6] On April 10th (which was the mother's tenth week of pregnancy), her body-mass index was 35.9, as was calculated by Dr. Halstead on the basis of the mother's then weight of 190 pounds and her height of 5 feet, 1 inch. *See* Dr. Halstead's records, April 10th consultation date. Although the mother remained obese throughout her pregnancy, she was not suffering from diabetes, nor did she develop gestational diabetes.

[7] Methodist's maternal records, page 92 of 308. When quoting from the medical records, the Court spelled out abbreviations, corrected typographical errors, and omitted unnecessary capitalization.

[8] The mother's first child was delivered vaginally six years prior in 2008.

[9] The "external cephalic version" is the "version [or the re-positioning of the fetus] performed entirely by external manipulation." Stedman's Medical Dictionary (online edition) ("Stedman's"), Entry No. 982930.

[* 3]

mother of its availability. Rather, Dr. Halstead scheduled a C-section for Friday, November 7th, at Methodist because she performed her C-sections and other elective surgeries on Fridays.[10]

At 2:30 AM on Thursday, November 6th (which was one day prior to her scheduled C-section with Dr. Halstead), the mother experienced a premature rupture of her membranes ("PROM"), albeit without the onset of labor.[11] At 4:51 AM, the mother checked into Methodist where she met with Dr. Chinchankar, a colleague of Dr. Halstead then on call from PGS.[12] The fetal risk factors immediately preceding the C-section at 40 weeks, 3 days gestation, were three-fold: (1) the C-section (in and of by itself) subjected the baby to stress as was reflected by the early finding[13] that her skin was stained by meconium;[14] (2) the C-section delivery at 40 weeks, 3 days gestation was at the higher end of the "full term" range,[15] which, in turn, increased the likelihood of the fetus, in utero, passing meconium into the amniotic fluid, with the concomitant increase in the likelihood of the fetus aspirating on the meconium, known as

---

[10] Labor & Delivery Cesarean Section Surgical Booking Information Form, page 1 of 2 (part of Dr. Halstead's records).

[11] Methodist's neonatal records, page 00217 (documenting the timing of the mother's PROM at 2:30 AM on November 6th). Methodist's maternal records, page 20 of 308 (History & Physical).

[12] Methodist's maternal records, page 1 of 308 (Admission Face Sheet).

[13] Methodist's neonatal records, page 00066 (Nurse Yvette Maisonet-Chipocco's Assessment Form, performed at 8:00 AM and entered at 4:50 PM on November 6th, describing the baby's skin on admission to the neonatal intensive care unit as "Intact .. [and stained with] Meconium").

[14] Meconium is defined as "[t]he first intestinal discharges of the newborn infant, greenish in color and consisting of epithelial cells, mucus, and bile." Stedman's, Entry No. 533600.

[15] A neonate is considered "full term" when born between 39 weeks, 0 days and 40 weeks, 6 days of gestation. The baby was not "late term" because she was not born between 41 weeks, 0 days and 41 weeks, 6 days of gestation. Nor was the baby "post-term" because she was not born after completion of the 42nd week of gestation.

4

[* 4]

the meconium aspiration syndrome ("MAS");[16] and (3) the passage of 279 minutes from the mother's PROM at 2:30 AM until the commencement of the C-section at 7:00 AM increased the risk of infection to the baby.[17]

In the morning of Thursday, November 6th, which was 40 weeks and 3/7 days of her pregnancy, the mother underwent a C-section under the lumbar epidural anesthesia in Methodist's Labor & Delivery operating room (the "OR"). At 7:00 AM, Dr. Chinchankar made the initial incision. Nine minutes later at 7:09 AM, Dr. Chinchankar delivered the baby.[18] Immediately on delivery, "[t]he nose and mouth [of the baby] were suctioned [by Dr. Chinchankar,] and the [baby] was handed to [the] awaiting [second-year resident] pediatrician" Samuel Leung, M.D. ("PGY-2 Leung").[19] No attending physicians either from the pediatrics or the neonatology units of Methodist were present in the OR at the time of delivery. Attending neonatologist, Ashraf Gad, M.D. ("Dr. Gad"), entered the OR at 7:13 AM (or at four minutes of the baby's life), after he had been summoned to the OR by PGY-2 Leung one minute earlier at 7:12 AM.[20]

---

[16] "Meconium aspiration" is the "intrauterine aspiration by the fetus of amniotic fluid contaminated by meconium." Stedman's, Entry No. 79690. Whereas "meconium aspiration" is an intrauterine event, the "meconium aspiration syndrome is a post-natal diagnosis.

[17] Methodist's neonatal records, page 00217 (calculating the interval from the time of the mother's PROM to the baby's delivery time at 279 minutes).

[18] Methodist's maternal records, pages 31-33 of 308 (Operative Report).

[19] Methodist's maternal records, page 33 of 308 (quoting from the Operative Report).

[20] According to Dr. Gad's note (at page 00023 of Methodist's maternal records), he "was called at 3 minutes [and] arrived at 4 minutes [of life]." Methodist's maternal records did not document the timing of physicians' arrival at the OR. Conversely, Methodist's neonatal records (at page 25 of 308) timed Dr. Gad's arrival at the OR at 7:12 AM (or at 3 minutes of life), which was one minute earlier than what Dr. Gad stated in his note. Further, Methodist's neonatal records (at pages 25-26 of 308) timed PGY-2 Leung's arrival at the OR at 7:08 AM, which was when the baby's body was delivered, with her head being delivered one minute later at

(footnote continued)

5

The baby's APGAR scores were below 7 on the scale of 1 to 10 (and thus below normal) at each of the three assessments.[21] The baby's APGAR score was 1 at one minute of life, 4 at five minutes of life, and 5 at ten minutes of life.[22] At each of the three assessments, the baby's respirations were documented as "absent."[23] Dr. Gad's top differential diagnosis for the cause of the baby's respiratory distress was the persistent pulmonary hypertension of the newborn ("PPHN").[24] PPHN is characterized by the right-to-left shunting of circulation through a patent foramen ovale and/or a patent ductus arteriosus ("PDA") as a result of pulmonary vasoconstriction, as more fully set forth in the margin.[25] Dr. Gad's daytime replacement, attending neonatologist Danthanh Hoang, M.D. ("Dr. Hoang"), concurred with Dr. Gad's position that the PPHN was the baby's primary diagnosis.

During the baby's first or "golden hour" of life from 7:09 AM to 8:09 AM, various measures and interventions were undertaken by PGY-2 Leung and neonatologist Dr. Gad, initially in the OR and subsequently in the neonatal intensive care unit ("NICU") to increase her oxygenation and reduce her PPHN, and, more generally, to transition her from the fetal

---

7:09 AM. On delivery, the passage of "terminal meconium" (*i.e.*, the passage of meconium in the final stages of delivery) was documented.

[21] Dr. Gad's April 28, 2021 deposition transcript, page 240, lines 24-25 ("A normal APGAR [score] is an APGAR [score] that's more 7 in total."); page 241, lines 5-6 ("In general, we say low APGARs if [they are] 7 or below.").

[22] Methodist's neonatal records, pages 00218-00219.

[23] Methodist's neonatal records, page 00218.

[24] Dr. Gad's April 28, 2021 deposition transcript, page 247, line 22 to page 251, line 25.

[25] The fetal circulation is different from (and, at birth, must change to that of) the adult. In a healthy transition from the fetal circulation to the adult circulation (which did not happen in this case): (1) the baby should have achieved independent respiration and lung expansion at birth; (2) her pulmonary vascular resistance or vasoconstriction (which had been high at the fetal stage) should have decreased; and (3) her foramen ovale and ductus arteriosus (the circulatory bypasses that were extant at the fetal stage) should have been constricted within hours after birth and thereafter anatomically closed within days after birth.

6

[* 6]

mode of blood circulation to the adult mode of blood circulation (collectively, the "OR-based

measures" and, collectively, the "NICU-based measures," respectively).

The OR-based interventions, which started at 7:09 AM and continued until

approximately 7:29 AM,[26] consisted of the following sequence of events: (1) the initiation of

the manual, positive pressure ventilation with a bag and mask ("PPV");[27] (2) the "in-and-out"

endotracheal intubation (performed by Dr. Gad) to remove meconium and other aspirated

material from beneath the baby's glottis (i.e., below her vocal cords);[28] (3) resumption of the

bag/mask PPV; (4) a "taped" or fixed endotracheal intubation (performed by Dr. Gad);[29] and

(5) a transfer of the baby from the OR to the NICU sometime between 7:29 AM to 7:40 AM,

with the baby's arriving at the NICU between 20 minutes and 31 minutes of life.[30] Although

---

[26] At 7:29 AM, an order to admit the baby to the NICU was entered (Methodist's maternal records, page 155 of 308). At 7:40 AM, the baby was on the ventilator in the NICU (Methodist's neonatal records, page 00205).

[27] PGY-2 Leung testified (at page 68, lines 12-15 of his deposition testimony) that he "would have helped with initial resuscitation, but the medical decision-making would have been from the attendings" (i.e., Dr. Gad). In turn, Dr. Gad testified (at page 169, line 13 to page 170, line 10 of his April 28, 2021 deposition testimony) that PGY-2 Leung would have initiated the PPV which (in Dr. Gad's opinion) would have started at 30 seconds of the baby's life and continued for 30 seconds until the baby's first minute of life. Dr. Gad conceded (at page 169, line 23 to page 170, line 2 of his April 28, 2021 deposition) that he "wouldn't [know]" when (and for how long) the PPV had been started (and continued) by PGY-2 Leung before his arrival at the OR at 7:13 AM.

[28] According to Dr. Gad (at page 194, line 22 to page 195, line 3 of his April 28, 2021 deposition testimony), the baby was receiving "blow-by" oxygen during the "in-and-out" endotracheal intubation.

[29] Methodist's neonatal records, page 00023 (Dr. Gad's History & Physical Note, timed at 8:49 AM and cosigned by his successor, Dr. Hoang, at 9:07 AM, stating that Dr. Gad "[re-]intubated [the baby] with [a] 3.5 [endotracheal tube which he] . . . secured at 9.5 cm from [the baby's] upper lip. [The endotracheal tube] position [was] confirmed with [a carbon-dioxide detector] and chest auscultation. . . . [The baby's oxygen] saturations by pulse oximeter ranged 65-80% on 100% FiO2. Parents informed about [the] NICU admission for respiratory distress and further evaluation and management."). It was unclear from the foregoing note whether the baby was receiving oxygen from a mechanical ventilator or from the assisted PPV, upon Dr. Gad's re-intubation of the baby in the OR and until her transport to the NICU. Dr. Gad's deposition testimony in that regard was likewise unclear. See Dr. Gad's April 28, 2021 deposition transcript, page 235, lines 2-7 ("Once [the baby] was intubated, once the [endotracheal] tube is in, now [she] start[s] to be ventilated through a mechanical ventilator. . . But [the baby] has been ventilated with PPV as well, with [the] assisted ventilation.").

[30] According to Dr. Gad, it took 15 to 20 minutes to transport the baby from the OR to the NICU. See Dr. Gad's April 28, 2021 deposition transcript, page 206, line 22 to page 207, line 7 ("[O]nce the baby was born at 7:09

(footnote continued)

[* 7]

Dr. Gad found no meconium beneath the baby's glottis during his "in-and-out" endotracheal intubation,[31] the meconium aspiration syndrome (or MAS) could not be ruled out and remained a differential diagnosis.[32] Further, "thick, cloudy[,] moderate secretions" were "suctioned orally and [with the] endotracheal tube" at 8:35 AM in the NICU.[33]

The remainder of the baby's first day of life, all spent in the NICU, was filled with numerous NICU-based measures. At 7:42 AM, the baby received Curosurf in the form of intratracheal suspension to improve oxygenation and increase lung compliance.[34] At 8:10 AM, an early episode of pneumothorax[35] was treated by needle extraction.[36] At 12:30 PM, the baby was started on intravenous Milrinone, a pulmonary vasodilator.[37]

---

[AM], . . . we took the baby to the [NICU] at 7:39 [AM]. So, 30 minutes [between the OR and NICU]. If you take off 15-20 minutes of this baby's life transporting . . . and establishing and connecting the equipment[ ] . . . , that was maybe five to ten minutes – 12 minutes, maximum – [which the baby spent] in the [OR].")`. It was unclear from the record how the baby was oxygenated during her 15 to 20-minute transport from the OR to the NICU. Contrary to the repeated assertion of Methodist's expert pediatrician (in ¶ 37 of the affirmation of Jesus Jaile-Marti, M.D., dated April 2, 2024), the baby was *not* "transferred to the NICU within 5-12 of her delivery" (*i.e.*, by 7:14 AM to 7:21 AM) because Dr. Jaile-Marti failed to account for the travel time from the OR to the NICU. As quoted above, Dr. Gad conceded that the baby arrived at the NICU at 7:39 AM. Likewise incorrect was the joint position of plaintiff expert obstetrician and her expert neonatologist (in ¶ 31 of their respective affirmations) that the baby was admitted to the NICU at 8:00 AM.

[31] Methodist's neonatal records, page 00025 (PGY-2 Leung's History & Physical Note timed at 4:03 PM on November 6th and cosigned by Dr. Gad at 6:55 PM on November 13th, stating that the "[b]aby was endotracheal[ly] suctioned one time without meconium in aspirator"); page 00023 (Dr. Gad's History & Physical Note, timed at 8:49 AM and cosigned by his successor, Dr. Hoang, at 9:07 AM, stating that Dr. Gad "intubated the baby for possible meconium, no meconium below [the vocal] cords").

[32] Methodist's neonatal records, pages 00066-00067 and 00072 (Nurse Yvette Maisonet-Chipocco's Assessment Form, performed at 8:00 AM and entered at 4:50 PM on November 6th, and Nurse Maisonet-Chipocco's Admission-to-Unit note, timed at 6:24 PM on November 6th, both stating that "[the baby was] admitted [to the NICU] for . . . suspected meconium aspiration"). *See* Medical records of Cohen Children's Medical Center of New York, North Shore LIJ Health System, Hospital Medical Summary, unnumbered page 3; LIJ's neonatal records, Admission Exam note, stating, in relevant part, that the baby's "[d]elivery [was] complicated by meconium."

[33] Methodist's neonatal records, page 00074 (Note by Ursula Porter, RN, timed at 8:35 AM).

[34] Methodist's neonatal records, page 00017 (Discharge Summary).

[35] "Pneumothorax" is "[t]he presence of free air or gas in the pleural cavity." Stedman's, Entry No. 704500.

8

[* 8]

At 2:30 PM, the synchronized intermittent mandatory ventilation ("SIMV") mode that had been selected by Dr. Gad at the baby's admission to the NICU,[38] was switched by Dr. Hoang to the high-frequency oscillatory ventilation ("HFOV") mode.[39] The switch was prompted by two events: (1) the earlier and repeated observations that the baby's "[p]re[-] and post[-]ductal saturations . . . started to differ, [with the] post[-]ductal [oxygen] saturations being consistently in the upper 60's [, whereas the] pre[-]ductal [oxygen saturations were] in the upper 70's, all [the] while [the baby was] still being on 100 % oxygen;"[40] and (2) that the "[b]aby [was] very agitated," requiring continuous sedation with Fentanyl.[41]

---

[36] It was unclear from the record whether two (rather than one) needle aspirations of air from the baby's chest were performed in the course of her NICU stay. The first needle aspiration of air was performed at 8:10 AM when 22 cc of air was removed. *See* Methodist's neonatal records, page 00043 (Procedure Note, stating that "22 cc of air [was] removed" at 8:10 AM), and page 00064 (Diagnostic Radiology; Chest X-ray report, performed at 9:06 AM, stating "[r]esolution [of] right pneumothorax[,] status post needle thoracentesis"). The second needle aspiration of air from the baby's chest was apparently performed at approximately 2:32 PM when 15 cc of air was removed. *See* Methodist's neonatal records, page 00033 (Dr. Hoang's Progress Note, timed at 2:32 PM, stating "[p]ossible small anterior pneumothorax on cross table view. Needle aspiration performed, 15 cc [of] air [was] aspirated."), referencing Methodist's neonatal records, page 00061 (Diagnostic Radiology; Chest X-ray report, performed at 11:19 AM and stating that "[o]n the cross[-]table lateral view, there is pneumothorax seen anteriorly."). In addition, LIJ's Admission Exam note stated, in relevant part, "status post-needle times 2," thus confirming that the baby underwent two (not one) needle aspirations for pneumothoraces. The foregoing neonatal chart entries (both in Methodist's records and in LIJ's records) appeared to contradict the position of plaintiff's expert pediatrician (in ¶ 58 of his/her affirmation, dated June 10, 2024) that "no further needle aspirations were performed on the [baby] after the initial aspiration at 8:10 AM."

In any event, the baby was no longer suffering from a pneumothorax by the end of her NICU stay and transfer to LIJ. According to Dr. Hoang (at page 301, lines 2-11 of her deposition testimony), "the last [chest] X-ray [of the baby] was done at [9:15 PM], and this [radiology report] says . . . 'No pneumothorax evident.' . . . [Pneumothoraces] can resolve on their own. When there's a small one, we don't generally have to do anything about [a pneumothorax]; [pneumothoraces will] resolve on their own."), referencing Methodist's neonatal records, page 00058 (Diagnostic Radiology; Chest X-Ray Report at 9:15 PM).

[37] Methodist's neonatal records, page 00017 (Discharge Summary).

[38] Methodist's neonatal records, pages 00204-00205 (Respiratory).

[39] Methodist's neonatal records, page 00209 (Respiratory).

[40] Methodist's neonatal records, page 00018 (Discharge Summary). The *pre*-ductal oxygen saturation measured the baby's oxygen saturation in her right hand (or toward her upper body), whereas the *post*-ductal oxygen saturation measured her oxygen saturation in her right or left foot (or toward her lower body).

[41] Methodist's neonatal records, pages 00033-00034 (Dr. Hoang's Progress Note, timed at 2:32 PM).

[* 9]

At Dr. Hoang's order at 4:00 PM, inhaled nitric oxide ("iNO"), a gaseous vasodilator, was added to the mechanically supplied oxygen at the rate of 20 ppm,[42] to be decreased at 6:00 PM to the rate of 18 ppm.[43] Despite the foregoing measures, the baby's pulmonary output remained at the lower end of the life-sustaining range. Every hour between 4:00 PM and 10:00 PM (with the exception of the 5:00 PM readings), the baby's pre-ductal oxygen saturation exceeded her post-ductal oxygen saturations by a range between 12% and 19%,[44] as more fully set forth in the margin.[45] Further, the baby's bedside or point-of-care ("POC") arterial blood gases from 4:21 PM and thereafter were, for the most part, outside the normal range, as more fully set forth in the margin.[46] At 5:32 PM, the consulting cardiologist recommended that the baby should be transferred to another hospital for escalated care because the baby "either ha[d]

---

[42] Methodist's neonatal records, page 00222, text note 38 (Newborn).

[43] Methodist's neonatal records, page 00223, text note 39 (Newborn).

[44] This significant excess of the baby's pre-ductal oxygen saturation over her post-ductal oxygen saturation suggested that she might have been suffering from a differential cyanosis, meaning that the upper half of her body was pink (indicating that she was receiving adequate pre-ductal oxygen saturation), whereas the lower part of her body was blue (indicating she was not receiving adequate post-ductal oxygen saturation).

[45] Methodist's neonatal records, pages 00199-00201 (Vital Signs) (4:00 PM: pre-ductal 83% > post-ductal 70% [13% excess]; 6:00 PM: pre-ductal 99% > post-ductal 86% [13% excess]; 7:00 PM: pre-ductal 97% > post-ductal 80% [17% excess]; 8:00 PM: pre-ductal 94% > post-ductal 82% [12% excess]; 9:00 PM: pre-ductal 99% > post-ductal 80% [19% excess]; 10:00 PM: pre-ductal 99% > post-ductal 80% [19% excess]). Conversely, in the early part of her stay at the NICU, the baby's "pulse oximetry [readings had] remained in mid-80s, same on pre[-] and post[-]ductal measurements." Methodist's neonatal records, pages 00275, 00276, 00281, and 00283 (Discharge Summary and Discharge Notes).

[46] Methodist's neonatal records, pages 00019-00020 (Discharge Summary) and page 00055 (Respiratory Therapy), summarizing the baby's POC arterial blood gases, as measured at 4:21 PM, as follows: (1) "low" pH at 7.24; (2) "high" pCO2 at 52; (3) "critical" pO2 at 36; (4) "low" O2 Saturation at 59%; and (5) "low" Base Excess at -5. A "critical" POC arterial blood gas result was first reported at 4:21 PM since the measurement of the POC arterial blood gases had begun approximately five hours earlier at 11:47 AM. *See* Methodist's neonatal records, pages 00019-00020. Five hours later at 9:54 PM, the baby's POC arterial blood gases were as follows: (1) "low" pH at 7.23; (2) "high" pCO2 at 54; (3) "critical" pO2 at 33; (4) "low" O2 saturation at 52; and (5) "low" Base Excess at minus 5. *See* Methodist's neonatal records, page 00054. On re-measurement at 10:35 PM and after the baby was placed on 100% FiO2, the baby's POC arterial blood gases in the category of pH and pO2 improved to the "low" of 7.33 and the "low" of 51, respectively, whereas the remaining categories reached the normal range, including O2 of 83%. *See* Methodist's neonatal records, page 00054.

10

[* 10]

myocarditis [which was later ruled out] or [a] significant perinatal event."[47] At around that time, the baby's NICU team likewise determined that the baby needed to be transferred to an outside hospital which could provide her with an ECMO (pulmonary and cardiac bypass) treatment.

At approximately midnight on November 7th, the baby was transferred by ambulance from Methodist (and 00:24 AM of November 7th she was admitted) to nonparty Cohen Children's Medical Center of New York, part of North Shore LIJ Health System ("LIJ"), with "acute respiratory failure."[48] The baby's primary admitting diagnoses at LIJ were PPHN and persistent fetal circulation.[49] Her other diagnoses included a meconium aspiration syndrome (MAS).[50] In that regard, the baby's cardiopulmonary status on admission to LIJ was described as a "full-term infant with meconium aspiration syndrome and PPHN [who was] admitted directly to the Pediatric Intensive Care Unit for ECMO."[51]

In the course of her hospitalization at LIJ, the baby (after undergoing two successive types of the ECMO therapy) was successfully weaned off the ventilator and, by the time of her discharge from LIJ to Methodist on December 1st, had been on the CPAP for the preceding four days.[52] In addition to the CPAP, her discharge plan from LIJ to Methodist consisted of

---

[47] Methodist's neonatal records, page 00030 (Consultation Note by pediatric cardiologist Manoj Chhabra, M.D., timed at 5:32 PM); page 00032 (Consulting Note by Dr. Chhabra, timed at 9:46 AM).

[48] LIJ's neonatal records (Admission Face-Cover Sheet).

[49] LIJ's neonatal records (Admission Exam note).

[50] LIJ's neonatal records (Clinical Summary – Diagnoses).

[51] LIJ's neonatal records (Discharge Cumulative Comments – General).

[52] LIJ's neonatal records (Clinical Summary – Respiratory Support).

11

[* 11]

(1) vasodilator sildenafil 5 mg to be taken three times daily; and (2) continuous feeding (pumped breast milk) at 25 ml per hour via a nasoduodenal tube.[53]

On December 1st at 3:50 PM, the baby was returned from LIJ to Methodist for the latter's continuation of her care.[54] The course of the baby's rehospitalization at Methodist was largely uneventful, and she was discharged home without any respiratory support on December 29th. Although the child functions normally for the most part, she had (and apparently continues to have) significant intellectual and cognitive deficiencies: (1) at the age of 4 years and 6 months, she tested at a full-scale IQ of 89 in the 23rd percentile, indicating low-average functioning;[55] and (2) she suffered (and apparently continues to suffer from) inattentiveness and inability to retain information, which required (and apparently still requires) intervention at school.[56]

On October 6, 2020, pediatric neurologist, Walter J. Molofsky, M.D. ("Dr. Molofsky"), examined the then-six-year-old child on Methodist's behalf (the "IME"). During his IME, Dr. Molofsky did not administer any tests to the child, such as an IQ test to determine whether or not her performance had improved in the preceding 18 months when she had taken the initial IQ test.[57] On March 11, 2021 or five months after his IME, Dr. Molofsky issued his two-page IME report. Therein, Dr. Molofsky either downplayed or completely overlooked the child's

---

[53] LIJ's neonatal records (Discharge Plan).

[54] Methodist's neonatal records, page 00225 (readmission summary).

[55] EvalCare Inc., Psychological Evaluation Report, dated May 21, 2019, unnumbered page 3.

[56] Mother's deposition transcript, page 265, lines 18-19 ("[The child] was currently the lowest in her class in terms of her development.").

[57] Dr. Molofsky's IME report failed to indicate what documents, if any, he had reviewed in connection with this neurological examination of the child, in particular the child's IQ test results at the age of 4 years and 6 months. According to the IME report (at page 1), the "[i]nterval history was provided [to him] by [the child's] mother."

12

ongoing developmental deficiencies. His IME report stated that: (1) the child, at the time, was "repeating Kindergarten"; (2) her "copying skills [were] immature"; (3) "[h]er reading skills [were] weak"; (4) "[s]he could identify one or two sight words [*i.e.*, words on sight]"; (5) she "ha[d] a mild immature affect but no focality to her neurological exam"; and (6) she had a "slightly low [muscle] tone," though he did not objectively measure it.[58]

In April 2017, plaintiff commenced the instant action against defendants (among others), alleging, in essence, that defendants' alleged malpractice caused the child's developmental delays and other injuries. Defendants interposed their respective answers. After discovery was completed and a note of issue was filed, defendants served their respective motions for summary judgment. On August 23, 2024, the Court reserved decision. Additional facts are noted when relevant to the discussion below.

### Standard of Review

"It is well settled that the proponent of a summary judgment motion must make a prima facie showing of entitlement to judgment as a matter of law, tendering sufficient evidence to demonstrate the absence of any material issues of fact." *Pullman v. Silverman*, 28 N.Y.3d 1060, 43 N.Y.S.3d 793 (2016) (internal quotation marks omitted). "Establishing entitlement to summary judgment as a matter of law requires the defendant to rebut with factual proof plaintiff's claim of malpractice." *Id.*

"The essential elements of medical malpractice are (1) a deviation or departure from accepted medical practice, and (2) evidence that such departure was a proximate cause of

---

[58] IME report, pages 1-2.

**13**

[* 13]

injury." *Mendoza v. Maimonides Med. Ctr.*, 203 A.D.3d 715, 160 N.Y.S.3d 663 (2d Dept. 2022) (internal quotation marks omitted). "A hospital or medical practice may be held liable under the doctrine of respondeat superior for the malpractice of an employee." *Weber v. Sharma*, 232 A.D.3d 930, ___ N.Y.S.3d ___ (2d Dept. 2024).

"A defendant moving for summary judgment . . . must demonstrate the absence of any material issues of fact with respect to at least one of the elements of a cause of action alleging medical malpractice:  (1) whether the physician deviated or departed from accepted community standards of practice, or (2) that such a departure was a proximate cause of the plaintiff's injuries" and, where wrongful death is alleged, of wrongful death as well. *Rosenthal v. Alexander*, 180 A.D.3d 826, 118 N.Y.S.3d 658 (2d Dept. 2020) (internal citation omitted). "When a defendant in a medical malpractice action demonstrates the absence of any material issues of fact with respect to at least one of those elements, summary judgment dismissing the action should eventuate unless the plaintiff raises a triable issue of fact in opposition." *Schwartz v. Partridge*, 179 A.D.3d 963, 117 N.Y.S.3d 300 (2d Dept. 2020) (internal citations omitted). "A physician's [expert affirmation] in opposition to a motion for summary judgment must attest to the defendant's departure from accepted practice, which departure was a competent producing cause of the injury." *Shahid v. New York City Health & Hosps. Corp.*, 47 A.D.3d 800, 850 N.Y.S.2d 519 (2d Dept. 2008). "Summary judgment is not appropriate in a medical malpractice action where the parties adduce conflicting medical expert opinions. Such credibility issues can only be resolved by a jury." *Feinberg v. Feit*, 23 A.D.3d 517, 806 N.Y.S.2d 661 (2d Dept. 2005) (internal citations omitted).

14

[* 14]

## Discussion[59]

### Dr. Halstead and PGS

The affirmation of plaintiff's board-certified obstetrician with the sub-certification in maternal-fetal medicine ("plaintiff's expert obstetrician") – coupled with the underlying record which must be viewed in a light most favorable to plaintiff as non-movant at this stage of litigation[60] – raised triable issues of fact as to both the departure and causation elements of plaintiff's medical malpractice (and ancillary) claim as against Dr. Halstead (and vicariously as against PGS), in contradiction to the opinions of Dr. Halstead/PGS's expert, Hilma M. Yu, M.D., a board-certified obstetrician/gynecologist ("Dr. Halstead's expert obstestrician"). *See Gupta v. Lescale*, 224 A.D.3d 668, 204 N.Y.S.3d 554 (2d Dept. 2024).

As an initial matter, plaintiff's expert obstetrician opined that Dr. Halstead departed from accepted standards of obstetrical care in failing to attempt (or even to offer to the mother an option of attempting) "an external cephalic version . . . around 36 to 37 weeks of gestation" to turn the fetus in breech to the cephalic position and thus enable the mother to deliver vaginally (as was the instance with her first child) as well as avoid the inevitable stress on the baby that would be occasioned by the C-section delivery.[61]

---

[59] Because each group of defendants established, prima facie, their respective entitlement to summary judgment as a matter of law, the Court (in the interest of brevity) addressed only the sufficiency of plaintiff's opposition.

[60] *See Vega v. Restani Constr. Corp.*, 18 N.Y.3d 499, 942 N.Y.S.2d 13 (2012).

[61] Dr. Halstead/PGS's counsel (in ¶ 7 of his reply affirmation) correctly pointed out that plaintiff's expert obstetrician (in ¶ 57 of his/her affirmation) was speculating that "[i]t [was] more likely than not that had Dr. Halstead properly informed the [mother] . . . about the potential of performing ECV, [the mother] would have asked for [it]." This contention, however, had no effect on the court's analysis. The heart of the matter was that Dr. Halstead unilaterally opted for the mother to undergo a C-section and never discussed ECV with her. *See* Plaintiff's May 30, 2019 deposition transcript, page 340, line 23 to page 341, line 16 (testifying that Dr. Halstead was the sole decision-maker for the mother's C-section). *See also* Dr. Halstead's deposition transcript,

(footnote continued)

15

More fundamentally, plaintiff's expert obstetrician (in ¶¶ 44 and 52 of his/her affirmation) faulted Dr. Halstead for failing "to recommend and schedule a timely [C]-section delivery of the [baby] at 39 weeks [of] gestation" in order to accommodate her own (Dr. Halstead's) personal preferences, as more fully set forth in the margin.[62] In particular, plaintiff's expert obstetrician opined (in ¶¶ 61-62 of his/her affirmation) that the approximately two-week delay in scheduling and performing the C-section (the "C-section delay") was harmful to the fetus (and subsequently to the baby) in two distinct ways. First, the C-section delay increased the likelihood of the mother suffering, in the interim, from a PROM without labor (which, in fact, happened in the early morning of Thursday, November 6th, one day before Dr. Halstead's scheduled C-section for Friday, November 7th). The mother's PROM at 2:30 AM on Thursday, November 6th (coupled with the inevitable 4-1/2-hour delay in the commencement of the C-section at 7:00 AM by Dr. Chinchankar at Methodist) exposed the fetus to the ascending maternal infection involving her cervical/vaginal flora (as was confirmed by the pathology report of the placenta).[63] According to plaintiff's expert obstetrician (in ¶ 62 of his/her affirmation), the other and more significant way in which the C-section delay

---

page 63, line 8 to page 64, line 2 ("[I]f the mother is insistent on having a vaginal delivery, we will offer an [ECV], *if possible*, with making the mother aware of the risks and complications thereof. And then explaining why a Cesarean section may need to be performed for a breech presentation. . . . [It would be primarily the patient's choice if [she was] insistent on having a vaginal delivery, that's when that would be *attempted] [u]nder certain circumstances*.") (emphasis added).

[62] Because Dr. Halstead performed C-sections and other elective surgeries on Fridays, she scheduled the mother's C-section for Friday, November 7th. *See* Dr. Halstead's deposition transcript, page 78, lines 6-9 ("I have no clinical responsibilities in the office on Friday, so that's when I do all my elective surgeries."). The prior Friday, October 31st, had been inconvenient for Dr. Halstead because it was her birthday. *See* Plaintiff's December 12, 2019 deposition transcript, page 81, lines 3-6 ("[Dr. Halstead] said she didn't want to schedule my C-section yet because her birthday was [on] Halloween [October 31[st]], so she didn't want . . . any surgery around her birthday.").

[63] Methodist's maternal records, page 52 of 308 (Pathology Report of Placenta) ("Histology demonstrates evidence of acute ascending/intraamniotic infection with established fetal inflammatory response. This pattern of pathology is most commonly attributed to ascending infection involving cervical vaginal flora.").

16

[* 16]

adversely affected the fetus was an increase in the likelihood of its passing meconium into the amniotic fluid, which passage, in turn, increased "the likelihood of the fetus aspirating on the meconium [in utero]."[64]

On the subject of proximate cause, plaintiff's expert obstetrician opined (in ¶¶ 43 and 64 of his/her affirmation) that Dr. Halstead's departures were, individually and collectively, "a substantial factor in causing [the baby's] respiratory distress by increasing the likelihood of meconium aspiration," which, in turn, contributed to "her respiratory distress, [as] compounded by [her] underlying idiopathic conditions of PPHN and PDA."

Contrary to the position of Dr. Halstead's obstetrician (in ¶ 61 of her affirmation as more fully set forth in the margin[65]), plaintiff's expert obstetrician (in ¶ 63 of his/her affirmation) correctly noted that Dr. Gad's failure to observe meconium below the baby's vocal cords did not exclude the meconium aspiration syndrome (MAS). As noted, meconium aspiration was an in-utero event, whereas the diagnosis of MAS was a post-natal event. At this stage of litigation, the opinion of plaintiff's expert obstetrician (in ¶ 63 of his/her affirmation) that the baby had inhaled meconium into her lower airways and lungs (*i.e.*, deeper than what Dr. Gad could have observed in his endotracheal examination of the baby's glottis) could not be excluded. Plaintiff's expert obstetrician's opinion (in ¶ 63 of his/her affirmation) that the baby suffered from MAS was corroborated by: (1) the meconium staining of the baby's skin as

_____

[64] The record was unclear whether the loss of amniotic fluid from the mother's PROM increased the thickness of meconium.

[65] According to Dr. Halstead's expert obstestrician (in ¶ 61 of her affirmation), the lack of finding of meconium below the baby's vocal cords on the endotracheal intubation unequivocally "exclude[d] the possibility of meconium aspiration as a potential issue causing harm to the baby."

17

[* 17]

was noted by a NICU nurse at 8:00 AM; and (2) multiple references to the MAS as

a differential diagnosis in both Methodist's and LIJ's neonatal charts.[66]

It is well established that a motion for summary judgment should not be granted where,

as is the instance here, (1) "the facts are in dispute; (2) "conflicting inferences may be drawn

from the evidence"; or (3) "there are issues of credibility." *Ruiz v. Griffin*, 71 A.D.3d 1112,

898 N.Y.S.2d 590 (2d Dept. 2010) (internal quotation marks omitted). Here, summary

judgment in favor of Dr. Halstead/PGS was not appropriate because: (1) the critical facts were

in dispute (e.g., whether or not the baby experienced a meconium aspiration syndrome); (2) the

parties adduced conflicting medical expert opinions (e.g., the adverse effect, if any, of the C-

section delay); and (3) there were issues of credibility (at a minimum, whether or not

Dr. Halstead offered ECV to the patient). *See Khutoryanskaya v. Laser & Microsurgery, P.C.*,

222 A.D.3d 633, 201 N.Y.S.3d 177 (2d Dept. 2023); *Rich v. Donnenfeld*, 191 A.D.3d 909,

138 N.Y.S.3d 381 (2d Dept. 2021).

## Methodist

Plaintiff likewise raised triable issues of fact as to Methodist on both the departure and

causation elements of her medical malpractice (and ancillary) claim. Plaintiff's expert

affirmation of a board-certified pediatrician with the sub-specialty in neonatal-perinatal

---

[66] The contention of Dr. Halstead/PGS's counsel (in ¶ 4 of his reply affirmation, dated August 5, 2024) that "plaintiff's expert [obstetrician] relies upon speculation and 20/20 hindsight in the claim that the infant sustained meconium aspiration without addressing [the defense obstetrician's] explanation that the infant did not have meconium aspiration as there is no meconium below the cords based upon the treatment records and [Dr. Gad's] clinical exam," missed the point for two reasons. First, Dr. Gad's failure to discover meconium in the baby's trachea below her vocal cords on the endotracheal examination does not (and cannot) exclude plaintiff's expert obstetrician's alternative (and equally valid) explanation that the baby had inhaled the meconium in her lower airways and lungs. Second (and as noted above), the baby's skin was described as stained with meconium shortly after her admission to the NICU.

[* 18]

medicine ("plaintiff's expert pediatrician"), contradicted the conclusions of Methodist's experts that were set forth in the affirmation of Jesus Jaile-Marti, M.D., a board-certified pediatrician with the sub-certification in the neonatal-perinatal medicine ("Methodist's defense pediatrician"), and in the affirmation of Michael Marcus, M.D., a double board-certified pediatrician and immunologist with the sub-certification in pediatric pulmonology ("Methodist's defense pediatrician/immunologist"), that Methodist did not depart from accepted standards of pediatric and neonatal care and did not proximately cause (or contribute) to the baby's developmental and other injuries. *See Buch v. Tenner*, 204 A.D.3d 635, 166 N.Y.S.3d 243 (2d Dept. 2022).

At a minimum, plaintiff's expert pediatrician raised triable issues of fact, on the departure element of plaintiff's medical malpractice (and ancillary) claim as to whether the Methodist staff properly and timely implemented the OR-based measures and the NICU-based measures (as described above), and whether either category (or both categories) of those measures should have been supplemented by additional measures, such as chest compressions.[67] In particular, plaintiff's expert pediatrician opined (in ¶¶ 50-57, and 59-62 of his/her affirmation) that: (1) PGY-2 Leung departed from the accepted standard of pediatric care in failing to timely appreciate the baby's respiratory distress, perform chest compressions, and timely summon Dr. Gad to the OR; (2) Dr. Gad departed from the standard of pediatric

---

[67] Contrary to Methodist's position (in ¶¶ 36-40 of its counsel's reply affirmation), the alleged failure to perform chest compressions was not a new theory of liability because Dr. Gad repeatedly referred in his deposition testimony to a "chest compression" as a method of neonatal rescuscitation. *See* Dr. Gad's April 27, 2021 deposition transcript, page 77, lines 7-11 (If "the baby is in severe distress . . . [,] he needs . . . further and/or alternative methods of resuscitation, like endotracheal intubation and *chest compression*."); page 78, lines 3-8 ("The baby might be born on the first glance with a heart rate that's in that [low] range. . . . Then, it doesn't mean you have to intubate the baby, or put a breathing tube, or do a *chest compression*.") (emphasis added). *See also Palagye v. Loulmet*, 203 A.D.2d 729, 160 N.Y.S.3d 662 (2d Dept. 2022).

[* 19]

care in placing the baby on the mechanical ventilation in the synchronized intermittent mandatory ventilation (SIMV) mode, rather than on the high-frequency oscillatory ventilation (HFOV) mode, on admission to the NICU; (3) Dr. Gad further departed from the standard of pediatric care in failing to provide the baby with iNO on admission to the NICU; (4) Dr. Hoang (as Dr. Gad's successor neonatologist at NICU from approximately 8:45 AM) departed from the standard of pediatric care in failing to switch the baby to the HFOV mode of mechanical ventilation until 2:30 PM; (5) Dr. Hoang further departed from the standard of pediatric care in failing to order (and have the baby receive) the iNO until 4:00 PM; and (6) the Methodist staff failed to timely and appropriately treat the underlying causes of the baby's respiratory distress, which was a combination of the MAS, the idiopathic PPHN, and the right-to-left shunting of her circulation through the PDA.

On the subject of proximate cause, plaintiff's expert opined (in ¶ 64 of his/her expert affirmation) that the foregoing constellation of delays, missteps, and failures in managing the underlying causes of the baby's respiratory distress (*i.e.*, the MAS, the idiopathic PPHN, and the right-to-left shunting of circulation through the PDA) "led to improper oxygenation for almost the entire first day of [her] life," which, in turn, led to "the lasting neurological damage [as] manifested by her developmental delays" and academic deficiencies. *See Lee v. Westchester County Health Care Corp.*, 219 A.D.3d 1509, 196 N.Y.S.3d 527 (2d Dept. 2023); *Palagye v. Loulmet*, 203 A.D.3d 729, 160 N.Y.S.3d 662 (2d Dept. 2022).

Considering the complex nature of this case, it would be premature for the Court to rule as a matter of law which injuries did (or did not) relate to the alleged malpractice at issue. It would be for the jury to decide whether, as Methodist's defense pediatrician/immunologist

20

[* 20]

posited (in ¶¶ 6 and 28 of his affirmation), "the infant's alleged respiratory issues [were]

unrelated to the care at issue" and were "related to [her] pediatric asthma," or, conversely,

whether the MAS caused or contributed to the early-childhood onset of the baby's asthma.[68]

Under the circumstances, plaintiff raised triable issues of fact as to whether there were

departures from the standard of care and whether such departures decreased the chances of

a better outcome or increased the baby's (and now the child's) overall injuries, *without regard*

*(at the summary-judgment stage of litigation) to the level of impairment (or not) of her*

*particular organ(s) or function(s), be they respiratory, cardiac, neurological, intellectual,*

*cognitive, executive, information-processing, or otherwise. See Hanna v. Staten Is. Univ.*

*Hosp.*, 232 A.D.3d 585, 220 N.Y.S.3d 424 (2d Dept. 2024).

In sum, the conflicting expert opinions as to whether the Methodist staff met the

standard of care in treating and caring for the baby initially in the OR and subsequently in the

NICU, and the ensuing injuries (if any) from such alleged departures, would be the very sort of

factual disputes to be decided by the trier of fact after hearing and weighing the testimony of

the parties' witnesses, and not by a court on a motion for summary judgment. Live testimony

would be intrinsically different – and better – than the cold record which the court reviewed at

the summary-judgment stage. In a trial on the record, but not on summary judgment, the jury

would evaluate the persuasiveness of conflicting testimony and decide which was more likely

---

[68] Although the mother was diagnosed with asthma at the age of "twenty-four" and the maternal grandmother was diagnosed with asthma in "[h]er adult life" (plaintiff's January 10, 2019 deposition transcript, page 78, lines 22-25; and page 83, lines 4-7), the potential association of the meconium aspiration syndrome with the *early-childhood* onset of the baby's asthma cannot be ruled out as a matter of law at this stage of litigation.

[* 21]

true. *See generally Sillman v. Twentieth Century-Fox Film Corp.*, 3 N.Y.2d 395, 165 N.Y.S.2d 498 (1957), *rearg. denied* 3 N.Y.2d 941, 1957 WL 16633 (1957).

The Court reviewed the parties' remaining contentions and found them unavailing or moot in light of its determination.

## Conclusion

Based on the foregoing, it is

**ORDERED** that (in Seq. No. 3) the joint motion of defendants Dr. Halstead, Dr. Chinchankar, and PGS is granted to the extent that: (1) all direct claims as against Dr. Chinchankar, (2) plaintiff's second cause of action alleging lack of informed consent as against Dr. Halstead; (3) a portion of plaintiff's third cause of action seeking to recover for the mother's loss of her child's consortium as against Dr. Halstead, and (4) all vicarious claims as against PGS insofar as such claims are predicated on the alleged acts or omissions of Dr. Chinchankar, are all dismissed with prejudice and without costs or disbursements, and the remainder of their joint motion is denied, and it is further

**ORDERED** that (in Seq. No. 4) the motion of defendant Methodist is granted to the extent that: (1) plaintiff's second cause of action alleging lack of informed consent as against it, and (2) a portion of plaintiff's third cause of action seeking to recover for the mother's loss of her child's consortium as against it, are both dismissed with prejudice and without costs and disbursements, and the remainder of Methodist's motion is denied, and it is further

**ORDERED** that the clerk is directed to enter a judgment in favor of Dr. Chinchankar, and it is further

**ORDERED** that the action is severed and continued against remaining defendants, Dr. Halstead, PGS and Methodist, and the caption is amended as follows:

22

[* 22]

---------------------------------------------------------------------X

C.S., a Minor, by her Parent and Natural Guardian
TRACEY JACKSON, and TRACEY JACKSON, Individually,

Plaintiffs,

-against-

KELLY HALSTEAD, M.D.,
PROFESSIONAL GYNECOLOGICAL SERVICES, P.C., and
METHODIST HOSPITAL OF BROOKLYN, d/b/a
NEW YORK-PRESBYTERIAN/BROOKLYN METHODIST
HOSPITAL,

Defendants.

---------------------------------------------------------------------X

; and it is further

**ORDERED** that Methodist's counsel shall electronically serve a copy of this Decision

and Order with notice of entry on the other parties' respective counsel and shall electronically

file an affidavit of service thereof with the Kings County Clerk, and it is further

**ORDERED** that the parties are directed to appear remotely at the Alternative Dispute

Resolution Conference on March 10, 2025, at 11A.M.

This constitutes the Decision and Order of the Court.

ENTER,

Genine D. Edwards
J.S.C.

23

[* 23]